United States Magistrate Judge Mary Alice Theiler

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY STEPHENS.,<br><br>Defendant. | NO. CR21-129JCC<br><br>UNITED STATES' CONSOLIDATED MEMORANDUM IN SUPPORT OF DETENTION |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER CONRY,<br>a/k/a Phazar,<br><br>Defendant. | NO. MJ21-500<br><br>UNITED STATES' CONSOLIDATED MEMORANDUM IN SUPPORT OF DETENTION |

The United States of America, by and through Acting United States Attorney Tessa M. Gorman, and Assistant United States Attorneys Karyn S. Johnson and Lyndsie Schmalz, respectfully submits this memorandum in support of its detention motions in these related matters.  The United States respectfully submits that these defendants are

United States' Consolidated Memorandum in Support of Detention - 1
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

1   unable to overcome the presumption against detention that applies to this matter, and

2   should therefore be ordered detained.

# I.   STATEMENT OF FACTS

## A.   Overview of the Investigation

These cases arise out of a joint investigation by the Internal Revenue Service Criminal Investigations (IRS-CI), U.S. Department of Homeland Security, Immigration and Custom Enforcement (ICE), Homeland Security Investigations (HSI), and U.S Postal Inspection Service (USPIS).  The investigation arose out of an undercover operation that IRS-CI has been conducting into money laundering on the Darknet.[1]  In December 2018, an individual later identified as **Jeffrey Stephens** responded to advertisements posted by IRS-CI on Darknet marketplaces, in which IRS-CI posed as a money launderer offering to "legitimize" illegal proceeds by anonymously converting cryptocurrency into U.S. dollars.  Between December 2018 and the present, Stephens conducted 84 suspected money laundering transactions with IRS-CI.   In almost all of these transactions, Stephens transferred his cryptocurrency (bitcoin, Monero and Ether) to IRS-CI.  IRS-CI then delivered an equivalent amount of cash to Stephens, as directed by Stephens, mailing it to Certified Mail Receiving Agencies ("CMRAs")[2] located throughout Western Washington, or providing it to Stephens directly at face-to-face meetings with the undercover agent (UC1), who posed as the money launderer conducting these transactions.[3]  Additionally, in a few of these money laundering transactions, Stephens

---

[1] The "dark web" or Darknet is a portion of the "Deep Web" of the Internet, where individuals must use anonymizing software or applications to access content and websites.  Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web").  These online market websites use a variety of technologies, including the Tor network and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.  There are several marketplaces that have appeared on the dark web that have offered contraband for sale, including narcotics.  "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" on dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor and customer accounts are not identified by numbers, but rather monikers or "handles," much like the username one would use on a clear web site.

[2] A CMRA is a private business that accepts mail from the Postal Service on behalf of its customer.

[3] All of these meetings were recorded.

United States' Consolidated Memorandum in Support of Detention - 2
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

provided cash to IRS-CI in order to purchase cryptocurrency.  In this manner, Stephens laundered more than $1,000,000 of his cryptocurrency.

Over the course of Stephens' direct communications with UC1, Stephens has used secure messaging apps such as WickrMe and Signal, or encrypted email such as ProtonMail.  UC1 has also observed Stephens using Threema.  These applications use encryption technology that is commonly used by criminal organizations to ensure that communications cannot be intercepted by law enforcement.

The face-to-face meetings with Stephens and UC1 began in September 2020. During those meetings, Stephens told UC1 that the cryptocurrency involved in these transactions constituted proceeds of Stephens' sale of controlled substances through several vendor accounts on Darknet marketplaces for approximately three years.

For some of these money laundering transactions, Stephens directed UC1 to mail the cash to CMRA mailboxes rented to "James Zigler."  Records from the CMRAs show that Stephens used both a fake California Driver's License and a fake New York Driver's License in the name of "James Zigler," with two different dates of birth (neither of which is Stephens' actual date of birth) to rent these mailboxes:

//

//

//

United States' Consolidated Memorandum in Support of Detention - 3
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970





HSI and USPIS have confirmed that Stephens' Darknet vendor accounts distribute controlled substances by conducting several controlled buys of cocaine and ketamine from those accounts, beginning in June 2020 and as recently as June 2021.

During a meeting with the UC1 on March 25, 2021, Stephens told UC1 that he was having difficulty importing drugs from his overseas supplier due in part to COVID-related issues and asked if UC1 could help him resolve these issues. Stephens commented that he had tens of thousands of MDMA pills ("presses") overseas, awaiting

United States' Consolidated Memorandum in Support of Detention - 4
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

1  shipment to the United States.  Stephens also asked UC1 if he had a source of supply for

2  cocaine who charged less than the $30,000 per kilogram.

3       During meetings with UC1 in May and June of 2021, Stephens stated that he had

4  ordered hundreds of kilograms ("keys") from his overseas source, estimating that he

5  purchased more than 250 kilograms of MDMA and/or ketamine from this source.

6  Stephens estimated that he had probably sent this source "a million dollars directly" as

7  payment for these drugs.

8       During these meetings, Stephens further told the UC that, before he had

9  connections to suppliers who could provide him with bulk quantities of controlled

10 substances, he primarily distributed drugs locally.  According to Stephens, he operated an

11 "Uber" style delivery service where he dispatched four to five drivers to deliver drugs

12 throughout the greater Seattle area.  Stephens further bragged that he had only been in the

13 "business" (drug trafficking) for five or six years, which was "not that long" considering

14 "how far" he had gotten.

15      During meetings in mid-July 2021, Stephens and UC1 discussed importation of

16 controlled substances for Stephens.  At Stephens' request, UC1 introduced Stephens to a

17 different UC, who posed as an individual who could assist Stephens in securing a direct

18 source of cocaine.  Stephens stated that he anticipated that he would be able to distribute

19 multiple kilograms of cocaine per month.

20      In addition, at Stephens' request, UC1 introduced two additional UCs who posed

21 as individuals who could assist with the importation of drugs from overseas into the

22 United States.  They also discussed arranging for a "test pack" of drugs to be delivered to

23 Stephens by these UCs' associates.

24 **B.    Stephens introduces Conry to UC1**

25      On July 29, 2021 and August 25, 2021, **Alexander Conry** attended two meetings

26 with Stephens and UC1.  During these meeting Conry was introduced only by his

27 pseudonym, "Phazar."  During these meetings, the three discussed Conry's role:

28 managing Stephens' Darknnet vendor accounts and providing Stephens with advice and

technical support for the electronic devices and encrypted communications applications

United States' Consolidated Memorandum in Support of Detention - 5
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

that he uses.  In essence, Conroy is the chief technology officer for Stephens' drug trafficking organization (DTO).  The importance of Conry's role in Stephens' DTO cannot be overstated, as this is a Darknet-based DTO.

On July 29, 2021, UC1 met with Stephens in Seattle, Washington to discuss the timeline for a controlled delivery of a "test pack" of 2.5 kilograms of ketamine.  Conry joined Stephens and UC1 and began to discuss technical issues that Stephens was having with his electronic devices, cryptocurrency, and Stephens' Darknet vendor accounts.  Early in the meeting, Conry also stated that he had set Stephens up with a new cellular phone with Signal (the encrypted messaging application) on it.

This meeting also revealed that Conry played a hands-on role with Stephens' drugs as well.  During the meeting, Conry and Stephens began to discuss the quality of the controlled substances they currently had, with Conry expressing concern that their current supply was bad quality.  After noting that someone had said that "it" was "really bad," Conry stated: "That's not good.  That's just what he said dude.  I personally don't know the difference.  It looked good and it seemed to test alright."  Stephens then stated that the product "tested the same as the last."  Conry responded, "[I]t didn't.  Not with my test," indicating that Conry and Stephens were testing of the controlled substances they were selling over the Darknet to determine its quality.

Stephens and Conry further discussed how one of Stephens' Darknet vendor accounts had been down for some time, but that they had recently reactivated the moniker.  Conry expressed concern that customers would think that the new product – controlled substances – would be worse now that the account was back in business than it had been before.  Stephens told Conry, "[t]hat's your job to mediate that."  Conry indicated that it would "be a lot of messages." In other words, it was Conry's job to respond to orders and customers' messages on Stephens' Darknet vendor sites.

Stephens and Conry also bragged about the "recent reviews" they had received and how proud they were of those reviews.  Conry specifically singled out a positive review by stating:

United States' Consolidated Memorandum in Support of Detention - 6
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

CONRY:  And they might still love us and support us because we have always been good.  And then I would be like, it's not the best, but they liked us better than any of those other people.

STEPHENS:  I know.  I was telling him about the reviews.

CONRY:  They are incredible.

STEPHENS: I am so proud.

CONRY:  One said "everyone else is a waste of time.  We waited seven months for you guys to come back."  And I was like [inaudible]

UC1:  Oh yeah.

CONRY:  And I am like, it's me, it's me.  Like, nobody knows, but it's me.  I just feel like they wouldn't think it was me in their mind.

STEPHENS:  I think about that a lot, probably too much.

CONRY: Isn't it funny.

STEPHENS:  It is funny.

CONRY:  I am not that.

STEPHENS: I kinda of am.

CONRY:  You are that.  I have to try to be that image.

STEPHENS:  Right.  I definitely am.

CONRY:  And, I have to try to be that image.  And I have to get into character.

Customer reviews for one of Stephens' Darknet vendor accounts on White House Market included a review using the same language referenced by Conry during this conversation.

Stephens has repeatedly indicated his desire to engage in violence and his willingness to flee.  During the July 29, 2021 meeting with UC1, Stephens again indicated his desire to engage in violence with the government, a world-view with which Conry sympathized:

| | |
|---|---|
| UC1: | It's yes, I understand, from a company standpoint, if you make a lot of money, it's not ethical, I wouldn't want to do that though.  They just make a lot money off. |
| STEPHENS: | Where you're saying push back, push back here.  Fuck here.  **What we got to do is entrap them into the next Waco.  Them being the federal government.  But when?  That's my dream. [laughs]** |
| UC1: | Well, no.  We've talked about it.  With the division that they're already creating. |
| STEPHENS: | Right? |
| CONRY: | Kind of rude, but I mean, dude, I'm sorry.  You can't |

United States' Consolidated Memorandum in Support of Detention - 7
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

|   |   |   |
|---|---|---|
| 1 | | beat the US military. |
| 2 | STEPHENS: | Yes you can.  Yes you can.  Pakistan did. |
| | CONRY: | **In all honesty, guerilla warfare, kind of put them…** |
| 3 | | **give them a run for their money**. |
| 4 | STEPHENS: | **Yes, we're going to do that**. |
| | UC1: | It's also you're assuming that the military is your |
| 5 | | enemy. |
| 6 | STEPHENS: | Yes, they could also turn. |
| | CONRY: | I mean, a lot of them follow their orders [inaudible] |
| 7 | STEPHENS: | But they might not. |
| 8 | CONRY: | But a lot of them as individuals… |
| | STEPHENS: | They might flip — |
| 9 | UC1: | It depends on who they see as an enemy |
| 10 | STEPHENS: | Actually, yes. |
| | CONRY: | It's funny because many I'd say most of them |
| 11 | | nowadays, they are a, they're a don't tread on me kind |
| 12 | | of. |
| | STEPHENS: | Yes, that's what I'm saying. |
| 13 | CONRY: | So they, it's their… |
| 14 | STEPHENS: | …tables and turned. |
| | CONRY: | It's their God given right to defend the United States |
| 15 | | Constitution from a tyrannical government.  And if |
| 16 | | they are enforcing the tyrannical government, they |
| | | got, they got to think about that at some point. |
| 17 | STEPHENS: | Right. |
| 18 | UC1: | So that's why we'd be more likely to see that before… |
| | STEPHENS: | That and that that was a judo flip.  Right there, did you see |
| 19 | | that?  You got owned. |
| 20 | CONRY: | And some of the [inaudible] too. |
| | STEPHEN: | Fuck them to be honest. |
| 21 | CONRY: | I know, fuck them.  Most of them are… |
| 22 | STEPHENS: | Yes. |
| | CONRY: | Theoretically, like against big government, even |
| 23 | | though they enforce that. |
| 24 | UC1: | I know.  It's a tricky dynamic. |
| | CONRY: | It's weird. |
| 25 | STEPHENS: | **But I'm ready to kill regardless.  I just want** |
| 26 | | **everyone to know that**. |
| | UC1: | What was the second word there? |
| 27 | STEPHENS: | **I'm ready to kill regardless.** |
| | UC1: | Oh, regardless. |
| 28 | STEPHENS: | **I'm just ready to kill.** |
| | UC1: | I knew that. |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| 1 | STEPHENS: | **Regardless.  Like, whatever you're saying doesn't matter.  I'm gonna kill.** |
| 2 | CONRY: | **I'm will support that you do that.** |
| 3 | STEPHENS: | **I'm doing this my way.  Don't worry about it.  It will be a while. Don't worry.  Everything's fine.** |
| 4 | | **Listen, I am only going to do it if I am going to win**. |
| 5 | UC1: | You're the man of peace and he is the man of, what did you say… extreme violence. |
| 6 | STEPHENS: | **Extreme violence.** |
| 7 | UC1: | And he is the man of peace.  You guys make a good team. |
| 8 | STEPHENS: | I am a man of base. |

On August 25, 2021, UC1 met Stephens and Conry again in Seattle. During the meeting, they discussed their operational security.  For example, Stephens asked Conry if he only had his "burner" on him, referring to a phone that someone does not intend to use for long, making it more difficult for law enforcement to detect and investigate illegal activity.   In response, Conry explained that he never brought his phones to meetings, again illustrating an awareness of operational security.

During this meeting, Stephens told UC1 that Conry "is the guy.  My rock.  He is the brainpower.  Is security conscious. Will do his work, but doesn't need to get his hands dirty."   Conry himself, however, discussed his involvement in the delivery of "molly" (MDMA) as follows:

CONRY:  You know the transfers I have done.
STEPHENS:  Say what?
CONRY:  I have done every transfer possible.
STEPHENS:  I know.
CONRY:  I know how to, I've walked around for eight miles with 20 - 10 pounds of Molly [MDMA] on my back.
UC1:  Oh yeah?
CONRY:  It's not a big deal.  You have it [MDMA] in your messenger bag and you're just a businessman in a suit going home.  Then you hand somebody the thing and they hand you $200,000 dollars and it's not a big deal.  You can do it outside in a park when no one is around or you can go into their house or their car and do it.  Like, I've done it a hundred times. So, it's not a big deal.  No one is there.  If you know the people coming. It's easy.  It's easy.  However, I am not going to be the guy driving and

United States' Consolidated Memorandum in Support of Detention - 9
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

doing all that, but I've done it.  I've done it a hundred times.   It's kinda
fun.
STEPHENS:  It's kind a fun.  I got him excited.
CONRY:  **I don't mind taking a bus…. It's kinda fun taking a bus
across town with like $100,000 worth of shit [controlled substances] on
your back and nobody knows because you look the part**.

During the August 25 meeting, UC1 also told Stephens that the test pack should be

delivered during the week of Labor Day.  Conry was there during the conversation and,

although the type of drug in the test pack was not specified during this portion of the

conversation, Conry nevertheless knew he had to prepare a burner phone for this

delivery.

**C.**     **Statements Showing Stephens' Propensity for Violence and the Likelihood of
        Flight to Avoid Prosecution**

In addition to the above-referenced statements, Stephens has made numerous other

statements during his face-to-to face meetings with UC1 strongly indicating his

willingness to resort to violence and to flee.  A sampling of these statements is set forth

below.

**1.      December 3, 2020 meeting**

On December 3, 2020, Stephens, describing himself as a "man of extreme

violence," stated as follows:

| | |
|---|---|
| UC1: | Because of the electricity.  They're like Bitcoin uses as much as Portugal but XRP[4] uses… |
| STEPHENS: | How much does Fiat use? |
| UC1: | Well, that's one of the - - on the graph.  It's, like, here is Bitcoin, here's Fiat and then here's us and it's, like, XRP is like this and then it's, like, Fiat is this and then Bitcoin is, like, pfft. |
| MD[5]: | Bitcoin doesn't use more energy the Fiat. |
| UC1: | I'm sure that they could be skewing the numbers because they want people to do go XRP. |
| STEPHENS: | **I want to bomb XRP headquarters.  I want to kill** |

---

[4] XRP is a digital currency sometimes referred to as Ripple.
[5] An unindicted individual who was present at this meeting is referred to herein by his initials, MD.

United States' Consolidated Memorandum in Support of Detention - 10
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

| | | |
|---|---|---|
| 1 | | **everyone inside**. |
| 2 | UC1: | Okay. |
| | STEPHENS: | So - - . |
| 3 | UC1: | It probably wouldn't be the--no… |
| 4 | STEPHENS: | - - . |
| | UC1: | It probably wouldn't be the best investment that you |
| 5 | | had but… |
| 6 | STEPHENS: | Yeah.  **I'm not getting caught.  No.  I mean I--listen.** |
| | | **I am a man of extreme violence**. |
| 7 | UC1: | There you go. |
| 8 | STEPHENS: | - - . |
| | UC1: | It comes off.  That's the other thing that's clear is |
| 9 | | the, uh, - - . |
| 10 | STEPHENS: | No.  Uh, but actually useful.  He pointed this out.  It |
| | | makes sense.  XRP--it lags in its ascension. |
| 11 | UC1: | Okay.  Yeah. |

2.      **March 25, 2021 meeting**

During a face-to-face meeting with UC1 on March 25, 2021, Stephens again

expressed his interest in killing people, particularly Jewish people, and in leaving the

United States, never to return:

| | | |
|---|---|---|
| | STEPHENS: | So I was specifically, just with my normie friends who |
| | | have set up with tails now, who are like, oh, so |
| | | **basically the only reaction for, like, a normal man** |
| | | **who has a soul is to plan on killing lots of people.** |
| | | **Not like plan but you understand what I mean.** |
| | UC1: | Yeah, I understand what you mean. |
| | STEPHENS: | Right.  It's like the election.  The clear takeaway is |
| | | what, right?  That's what I mean by the way. |
| | UC1: | No, I got you. |
| | STEPHENS: | **So in other words, our goal is to make a lot of** |
| | | **money and then just ask for crap, not in like—** |
| | UC1: | 'cause you got to be prepared. |
| | STEPHENS: | Yeah. |
| | UC1: | Well, and then potentially—I like the whole media |
| | | aspect.  I'm a little bit of an idealist in some ways. |
| | | I'd like to think I'm more realistic than an idealist— |
| | STEPHENS: | I'm pragmatist by the way. |
| | UC1: | —or maybe I'm an optimistic, I don't know.  But I |
| | | like to think that maybe we can save things, but I |

United States' Consolidated Memorandum in Support of Detention - 11
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| 1 | | don't know, it's so fucked at this point. |
| 2 | STEPHENS: | **I want to move to Estonia and just nuke here.  The whole thing.  We canceled.  It's gone.  We could—** |
| 3 | UC1: | I thought we could, not that fucking long ago. |
| 4 | STEPHENS: | Pre-Trump.  Trump was the last chance. |
| | UC1: | They've proved that— |
| 5 | STEPHENS: | Right.  So they proved that they all have to die. |
| 6 | UC1: | That they were in— |
| | STEPHENS: | That they have to die. |
| 7 | UC1: | Or we go to Estonia and let them— |
| 8 | STEPHENS: | No, no, no.  Estonia is the new global HQ, right.  It's still going to happen here, and it will still be funded, |
| 9 | | but it's just like, I'm not going to be there.  I want to have a normal life. |
| 10 | UC1: | That's the thing. |
| 11 | STEPHENS: | I'm not going to have a family here. |
| 12 | UC1: | Right. |
| | STEPHENS: | That's freaking insane. |
| 13 | UC1: | Right. |
| 14 | STEPHENS: | If I have the option to not, why would I do that? |
| | UC1: | Could you imagine? |
| 15 | STEPHENS: | Yeah.  Sending your kids to a public school here, can you imagine? |
| 16 | UC1: | No.  That's why I haven't had any. |
| 17 | STEPHENS: | That's so irresponsible.  Why would you do that?  So I would go to Estonia or somewhere like that. |
| 18 | UC1: | I have to look into it more.  I haven't—every time you |
| 19 | | say it, I think, have you ever seen Encino Man? |
| 20 | STEPHENS: | No. |
| | UC1: | Maybe it's too lowbrow.  No, it was a comedy with |
| 21 | | Brendan Fraser and Pauly Shore back in like the '90s. |
| 22 | | And he was from Estonia or he said he was, there's some kind of Estonia connection. |
| 23 | STEPHENS: | Estonia is like a slightly cheaper Scandinavia— |
| 24 | UC1: | Okay. |
| | STEPHENS: |  —but they're less cucked, because migrants have less |
| 25 | | of a reason to go there, and Jews have less of a reason |
| 26 | | to hate them.  That's it, because it's former Soviet Union. |
| 27 | UC1: | Right, right. |
| 28 | STEPHENS: | So they hate them less, right, because they have less reason—they couldn't say anything back for a long time basically. |

United States' Consolidated Memorandum in Support of Detention - 12
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| UC1: | So, yeah, | |
| STEPHENS: | So uh, I like being candid about these things in that - - . | |
| UC1: | [Laughs] | |
| STEPHENS: | **Those fuckin' kike bastards are all going to die. Gas the kikes. Race war now - - Heil Hitler. I'm sorry**. | |
| UC1: | No, you're fine. | |

### 3.     May 6, 2021 Meeting

On May 6, 2021, Stephens touted his appreciation for killing as well as his ability to conceal same:

| | |
|---|---|
| STEPHENS: | You're talking about Oklahoma City?  'Cause we need to do it again. |
| UC1: | The vendor account? |
| MD: | You guys? |
| UC1: | No. |
| STEPHENS: | No. **McVeigh was a pussy. He's nothing**. |
| MD: | Guys. |
| STEPHENS: | **I'm just joking, but not really**. |
| MD: | Guys. |
| UC1: | Every time I see the news, I wonder. |
| STEPHENS: | **Oh yeah. I can hide it fairly well. Yeah**. |
| MD: | You could.  You definitely could. |

### 4.     July 15, 2021 Meeting

On July 15, 2021, Stephens expressed hatred for law enforcement and his desire for a firearm that could pierce body armor:

| | |
|---|---|
| STEPHENS: | Forget fist fight.  I'm going to get my gat [slang for a firearm]. |
| | [Laughter]. |
| STEPHENS: | **Let me get my cop killer 5-7**. |
| UC1: | Oh, yeah.  Whoa, what do you got?  Did you see the, the Trump Punisher 50AE?  It's like the big ass Desert Eagle stainless steel, but it's got the— |
| STEPHENS: | Oh, like, the 50? |
| UC1: | Yeah. |
| STEPHENS: | Yeah. |
| UC1: | It's got the etch style Trump Punisher head. |

United States' Consolidated Memorandum in Support of Detention - 13
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| 1 | STEPHENS: | **I want an MP7, bro**. |
| 2 | UC1: | Oh, yeah. |
| | STEPHENS: | **The body—** |
| 3 | UC1: | you got to—right. |
| 4 | STEPHENS: | **MP7 will go through body armor.** |
| | UC1: | Oh, yeah. |
| 5 | STEPHENS: | **Fuck you, faggot cops.**  [Imitated shooting sound]. |
| 6 | [Laughter] | |
| | STEPHENS: | **That's what I want.** |
| 7 | UC1: | Yeah. |
| 8 | STEPHENS: | Hell yeah.  I feel like a big man.  Yeah.  I'll be like you stupid cops, man.  I don't care.  The cops will |
| 9 | | work for me.  That's their attitude.. |
| 10 | UC1: | Right. |
| | STEPHENS: | We got to get—we got to get that setup. |
| 11 | UC1: | Right. |
| 12 | STEPHENS: | …. local police, federal police |
| | UC2: | Yeah. Not all cops are bad, you know? |
| 13 | STEPHENS: | No, I'm just kind of having fun. |
| 14 | UC1: | There's some— |
| | STEPHENS: | [Interposing] I mean no one's a fan of them now. |
| 15 | UC1: | Oh, yeah. |
| 16 | STEPHENS: | Except, Florida's cops seem cool. |
| | UC1: | Yeah. |
| 17 | STEPHENS: | Honestly, Florida cops seem the coolest because cops in Washington they're like pussified, now. |
| 18 | UC1: | Mm-hm. |
| 19 | STEPHENS: | Right.  All the—all the people—all the cool cops |
| 20 | | basically quit. |
| | UC1: | Yeah. |
| 21 | STEPHENS: | Because they were forced out.  So that's kind of like— |
| 22 | | you know and then also the D.C. police during the whole— |
| 23 | UC1: | [Interposing] Oh, I know that was insane. |
| 24 | STEPHENS: | —the not fake insurrection.  The one cop killed himself, clearly, in a seppuku,[6] right?  Very clear |
| 25 | | that's what happened. |
| 26 | UC1: | Oh, yeah. |
| 27 | STEPHENS: | Right?  Then, then they're, like, oh this was to be— |
| 28 | | |

---

[6]According to https://www.britannica.com/topic/seppuku, "seppuku, (Japanese: 'self-disembowelment') also called hara-kiri" is "the honourable method of taking one's own life practiced by men of the samurai (military) class in feudal Japan."

United States' Consolidated Memorandum in Support of Detention - 14
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

|       |            |                                                                                                                                                          |
|-------|------------|----------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1     |            | this—this evil, evil Trump perverse.  They attacked                                                                                                       |
| 2     |            | him.  None of that was real.  He killed himself because he realized what he had done.                                                                     |
| 3     | UC1:       | Mm-hm.                                                                                                                                                    |
| 4     | STEPHENS:  | Because he was, like, be—basically, be a traitor.  So I'm not a fan of all the cops in D.C. who didn't kill                                                |
| 5     |            | themselves.  Is that too big of a statement?  He's the                                                                                                    |
| 6     |            | one cop I like.                                                                                                                                           |
|       | STEPHENS:  | In D.C.                                                                                                                                                   |
| 7     | UC1:       | Right.                                                                                                                                                    |
| 8     | STEPHENS:  | The rest of them should've killed themselves.  He set the example, and they didn't follow.                                                                |
| 9     | UC1:       | Unless they know it's a trap.                                                                                                                             |
| 10    | STEPHENS:  | No, for sure.  **If only all the police in D.C. killed themselves.  Every single one of them, you know.**                                                 |
| 11    | UC1:       | It would make for—                                                                                                                                        |
| 12    | STEPHENS:  | **It would have been better.**                                                                                                                            |
|       | UC1:       | — current events for sure.                                                                                                                                |
| 13    | STEPHENS:  | **It would've been a hundred, hundred times better.**                                                                                                     |
| 14    |            | So...                                                                                                                                                     |

**5.    July 29, 2021 Meeting**

During the July 29, 2021 meeting, Stephens indicated his willingness to go underground, noting he knew his Monero password by heart, meaning, he had the financial wherewithal to do so:[7]

|       |            |                                                                                                                                                          |
|-------|------------|----------------------------------------------------------------------------------------------------------------------------------------------------------|
| 19    | UC1:       | So Hawaii, maybe we just set up something, that                                                                                                           |
| 20    |            | benefits…                                                                                                                                                 |
| 21    | MD:        | That benefits like the people that we know are in a very small - - .  I can legally get like changes—like                                                 |
| 22    |            | legally change a name or whatever you want and have                                                                                                       |
| 23    |            | a passport, a Hawaiian passport and diplomatic immunity.                                                                                                  |
| 24    | UC1:       | Do you have a passport out of Hawaii, it's not all like                                                                                                   |
| 25    |            | statewide?                                                                                                                                                |
|       | MD:        | One nation.                                                                                                                                               |
| 26    | UC1:       | Really?                                                                                                                                                   |
| 27    | MD:        | The Hawaiian nation.  I didn't know any of this.  Now                                                                                                     |
| 28    |            | listen to me.  This is a very good friend of mine.  This                                                                                                  |

[7] Conry was not present at this portion of the meeting.

United States' Consolidated Memorandum in Support of Detention - 15
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| 1 | | is a very good friend of mine who owns and operates |
| 2 | | Calyx and Trichome - - which is one of the best legal |
| 3 | | grows in Washington state.  If you look up Calyx and Trichomes - - , they're fucking - - the |
| 4 | | greatest marijuana you've ever seen in your life. |
| 4 | UC1: | Okay. |
| 5 | MD: | And we've been friends for many years. |
| 6 | UC1: | Yeah. |
| 6 | MD: | And he gets just doper and doper every— |
| 7 | UC1: | Doper and doper every year? |
| 8 | MD: | Uh-huh. |
| 8 | UC1: | Like what you did there. |
| 9 | MD: | But he's fucking legit, and he just came back from |
| 10 | | there.  And it's like, he's got connections.  He was hanging out with the —what? |
| 11 | STEPHENS: | **I'll be fine.  Never mind.  I just know my Monero password by heart?** |
| 12 | UC1: | That'll be the test. |
| 13 | STEPHENS: | Actually, I have my machine here anyway.  Anyway, |
| 14 | | go ahead.  So in other words, it might be - - . |
| 14 | MD: | Might be huge.  Something like this where it's like— |
| 15 | STEPHENS: | If we can get someone to fly in, they're okay.  And |
| 16 | | maybe a Julian Assange situation. |
| 16 | MD: | Well, exactly.  And beyond that— |
| 17 | STEPHENS: | **Is there a way that we can just at least get someone,** |
| 18 | | **it's not that long of a ship ride, right?  You get what I'm saying?** |
| 19 | MD: | **No, what I was going to say is there's parts of** |
| 20 | | **Hawaii that Americans would never go, right?  And on top of that, if you are—so if you go in there in** |
| 21 | | **an airplane, there's a manifest; they know where** |
| 22 | | **you are.  Go in on a boat, nobody has any fucking clue.** |
| 23 | UC1: | Right, right. |
| 24 | MD: | So, what my friend said he's going to do is he's going to rent a—rent a boat or just get a friend who has a big |
| 25 | | boat. |
| 26 | STEPHENS: | Yeah, yeah. |
| 26 | UC1: | **Yeah**. |
| 27 | MD: | Take his son and go over there. |
| 28 | STEPHENS: | **Well, there's an emergency—we have—there's a potential value here for emergency situations.** |
| | UC1: | Right, right. |

United States' Consolidated Memorandum in Support of Detention - 16
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

| | | |
|---|---|---|
| STEPHENS: | Maybe we could—just kind of like— |
| UC1: | Right. |
| STEPHENS: | —know what's possible. |
| UC1: | Yeah. |
| STEPHENS: | And this is - -. |
| MD: | And then monetize— |
| STEPHENS: | Listen, I called you an idiot earlier. |
| MD: | —and quantify what that means. |
| STEPHENS: | I meant that, and I still do. |
| MD: | Cheers to that, cheers. |

**D.      September 8, 2021 Takedown**

On September 7, 2021, an undercover Postal Inspector (USPIS UC), in the role of the driver transporting the ketamine, contacted Stephens via text message to provide instructions for Stephens to pick up the ketamine.  The USPIS UC told Stephens to meet him at the Discovery Park north parking lot at 8:30 a.m. on September 8, 2021.

On September 8, 2021, Stephens arrived at the meet location to pick up the "test pack" of 2.5 kilograms of ketamine as the passenger in a truck driven by another individual.  Once Stephens accepted the "test pack" of ketamine and put it in the truck, the takedown team contacted Stephens and the driver in the truck. Stephens was arrested pursuant to a previously issued warrant.  During a search of the truck, investigators seized various digital devices, a small stack of banded cash consisting primarily, if not exclusively, of hundred-dollar bills (the formal count at the bank is pending), and the "test pack" of purported ketamine.

On September 8, 2021, investigators executed a search warrant for Stephens' residence, a cabin in Concrete, Washington.  Among other items, investigators located a 12-gauge, Remington 870 Express Super Magnum Shotgun, loaded with four Fiocchi brand shotshells; an Aero Precision rifle, Model X15, with scope (an AR-15 style firearm); and a 12-gauge Benelli M4 shotgun (a tactical semi-automatic shotgun):

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



United States' Consolidated Memorandum in Support of Detention - 18
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

1   Investigators also seized thousands of rounds of ammunition, including more than

2 3,200 rounds of 9mm ammunition; more than 2,030 rounds of .223 ammunition; more

3 than 790 rounds of 12-gauge shotgun shells, plus a box of Fiocchi brand 12-gauge

4 shotgun shells; and four boxes of .45 caliber ammunition. Investigators also seized Hesco

5 body armor.   Investigators also seized 18 high-capacity magazines.

6   Investigators also seized marijuana packaged for distribution:



22   In addition to the marijuana, other seized drug evidence included a digital scale

23 with white powder residue, baggies of suspected cocaine; numerous suspected Xanax

24 bars; and suspected LSD.

United States' Consolidated Memorandum in Support of Detention - 19
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24



25
26          Investigators also searched computers, cellular telephones, storage devices,
27   documents, and other evidence.
28          On September 8, 2021, investigators contacted Conry at his job in Renton,
     Washington, in order to execute a search warrant for his person and vehicle.  Conry's key

United States' Consolidated Memorandum in Support of Detention - 20
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

ring had a thumb drive on it, which investigators seized. Agents advised Conry of his *Miranda* rights, although they had not yet arrested him. Thereafter, during the execution of search warrants for Conry's person and vehicle, a lock box was located under the driver's seat consistent with a secured box to store firearms or valuables. Prior to opening the box, law enforcement asked Conry if the box contained a firearm. Conry stated he had a firearm, but it was not in the box. Conry was arrested, and a complaint was subsequently sworn.

## II.   ARGUMENT

### A.   Legal Standard

This Court is of course quite familiar with the legal standards governing detention or release. To summarize, the Bail Reform Act provides that a court should detain a defendant pending trial if "no condition or combination of conditions . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The United States typically bears the burden of showing that a defendant poses a danger to the community by clear and convincing evidence, and it bears the burden of showing that a defendant poses a flight risk by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991).

The Bail Reform Act identifies four factors that a court should consider in analyzing detention issues: "(1) The nature and circumstances of the offense charged, including whether the offense . . . involves a narcotic drug; (2) the weight of the evidence . . . ; (3) the history and characteristics of the person, including . . . family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, . . . ; and . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . ." 18 U.S.C. § 3142(g). Of these factors, the weight of evidence is least important, and the statute neither requires nor permits pretrial determination of guilt. 18 U.S.C. § 3142(g).

United States' Consolidated Memorandum in Support of Detention - 21
*U.S. v. Stephens*, CR21-129JCC and *U.S. v. Conry*, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As noted above, the government generally has the burden of proof and persuasion regarding detention.  However, both Stephens and Conry are both charged with serious Title 21 offenses.  As to those charges, the Bail Reform Act expressly provides that:

> [s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 *et seq*.) . . . or an offense under section 924(c) . . . of title 18 of the United States Code . . .

18 U.S.C. § 3142(e).  The government has invoked the statutory rebuttable presumption of detention in its detention motions filed against Stephens and Conroy.

In a case where the presumption applies, Courts have found that the *defendant* bears the burden of producing evidence that he or she does not pose a danger to the community or risk of flight in order to rebut the presumption.  *See United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001);.*Stricklin*, 932 F.2d at 1354.  The government retains the burden of persuasion. *Mercedes*, 254 F.3d at 436.

However, even if a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear.  Rather, it remains a factor to be considered among those weighed by the district court.  *See Stricklin*, 932 F.2d at 1354-55; *Mercedes*, 254 F.3d at 436; *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992).  If the presumption were to vanish once a defendant produced *some* evidence, courts would not give adequate deference to the fact that Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society."  *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986); *United States v. Hare*, 873 F.2d 796, 798 99 (5th Cir. 1989).

Finally, it is well settled that at a detention hearing the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and

United States' Consolidated Memorandum in Support of Detention - 22
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  other relevant factors.  *See, e.g., United States v. Salerno*, 481 U.S. 739, 743 (1987);

2  *United States v. Winsor*, 785 F.2d 757 (9th Cir. 1986); *United States v. Cardenas*, 784

3  F.2d 937 (9th Cir.), *vacated as moot upon defendant's conviction*, 792 F.2d 906 (9th Cir.

4  1986).  The statement of facts herein is presented as such a proffer.

5  **B.     Stephens and Conry Should be Detained**

6          The government respectfully submits that rebuttable presumption of detention

7  should apply to Stephens and to Conry.  The government recognizes that it may be a

8  closer call with respect to Conry, however, the government respectfully submits that

9  detention is appropriate.

10         Stephens' and Conry's trafficking of dangerous drugs poses a danger to the public.

11  Stephens' money laundering of more than $1,000,000 in cryptocurrency, the drugs

12  obtained through orders placed on his vendor sites, and the items seized in Stephens'

13  cabin all show his involvement in trafficking at a high level.  Additionally, Stephens has

14  repeatedly espoused contempt for the government and endorsed acts of violence,

15  including against police officers.  Moreover, Stephens had accumulated the weaponry,

16  ammunition, and body armor to put his words into action when ready.

17         Both Stephens and Conry also pose a flight risk, with Stephens again presenting

18  the higher risk.  Both could operate their business from literally anywhere in the world.

19  They could potentially access their cryptocurrency from anywhere in the world.

20  Additionally, Stephens is believed to have engaged in the drug trafficking business for

21  years; investigators are unaware of any legitimate employment for him.  Stephens is also

22  known to have obtained and used fake identification documents.  The whereabouts of the

23  $1,000,000 in cash that Stephens obtained through money laundering with IRS-CI is

24  unknown.

25  //

26  //

27

28

United States' Consolidated Memorandum in Support of Detention - 23
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970

### III.   CONCLUSION

For the reasons set forth above, the government respectfully submits that defendants Stephens and Conry are unable to overcome the presumption against detention that applies to this matter and should therefore be held at the FDC pending trial.

Dated this 13th day of September, 2021.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*/s/ Karyn S. Johnson*
KARYN S. JOHNSON
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98116
Phone: (206) 553-7970
E-mail: karyn.s.johnson@usdoj.gov

United States' Consolidated Memorandum in Support of Detention - 24
*U.S. v. Stephens,* CR21-129JCC and *U.S. v.* Conry, MJ21-500

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98116
(206) 553-7970